MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:    2017 ME 238
Docket:      Yor-17-271
Submitted
  On Briefs:  November 29, 2017
Decided:     December 21, 2017

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, JABAR, HJELM, and HUMPHREY, JJ.

IN RE BENTLEE G. et al.


PER CURIAM

[¶1]  The father of Bentlee G. and Brenton G. appeals from a judgment of the District Court (Springvale, *Janelle, J.*) terminating his parental rights to Bentlee G., pursuant to 22 M.R.S. § 4055(1)(A)(1)(a) and (B)(2)(a), (b)(i)-(ii) (2016), and finding jeopardy as to Brenton G., pursuant to 22 M.R.S. § 4035(2) (2016).  The father challenges the sufficiency of the evidence to support (1) the court's finding of parental unfitness and its determination that termination was in Bentlee G.'s best interest, and (2) the court's finding of jeopardy as to Brenton G.  The mother of Bentlee G. and Brenton G. challenges the jeopardy order as to Bentlee G. (Springvale, *Foster, J.*) entered on January 26, 2016.  The mother argues that the court's finding of jeopardy as to Bentlee G. was "void for vagueness."  To the extent that the mother's challenges constitute a direct appeal from the jeopardy order issued on January 26, 2016, it is untimely and

2

not properly before us. Because the evidence supports the court's findings as to both parents, we affirm the judgment.

## I. BACKGROUND

[¶2] The court based its decision to terminate the mother's and the father's parental rights as to Bentlee G., and its finding of jeopardy as to Brenton G., on the following factual findings:

> [The mother and father] are the biological parents of Bentlee and Brenton. [The mother] has an older son . . . who was the subject of an earlier child protection matter. . . .
>
> [The mother and father] began their relationship in 2014, while [the mother's other son's] case with the Department was still pending. At that time, the Department required [the father] to engage in services so that [the mother's] reunification efforts with [the mother's other son] [would] not . . . be disrupted. . . .
>
> . . . .
>
> [The father's] reunification plan required him to "provide a safe and stable living situation that is free of unsafe individuals" and "work with providers to ensure that his mental health is appropriately addressed and learn the skills needed to care for his children while still meeting his own mental health needs" and "work with parenting supports to learn necessary skills to care for his child and will demonstrate an understanding of these skills by ensuring that the child's needs are consistently met when he is in [the father's] care" and "engage in mental health counseling and follow any and all recommendations made by his provider to ensure that his mental health needs are being met." Additionally, the plan calls on [the father] to develop coping skills, obtain safe and stable housing and learn appropriate parenting skills. . . .

[The mother's] plan closely mirrored that of [the father's] and included managing her mental health needs, developing skills to engage in healthy communications and relationships and to identify safe and appropriate caregivers, acquiring the skills to develop a lifestyle that promotes physical and emotional well-being, obtaining safe and stable housing, learning to appropriately manage medications, "managing her 'gut reaction' to yell scream, etc." when under stress, and to make decisions in the best interests of her children notwithstanding any impact on her romantic relationship and engaging in parenting classes in order to learn necessary parenting skills and co-parenting skills.

[A] licensed clinical psychologist . . . evaluated [the father] on October 26, 2016 and he issued his 23-page written report on November 4, 2016. [The clinical psychologist] notes that [the father] has an 11th grade education (lacks a GED) with a very spotty employment record (never held a formal job for any length of time). [The father] reported that he had been on disability for his entire adult life but he could not provide [the clinical psychologist] with information about the nature of his disability. [The father] reported suffering chronic back and joint pain from multiple accidents sustained while riding all-terrain vehicles (ATV's). [The father] reported a history of multiple arrests but was unsure of whether he had served time in jail. [The clinical psychologist], relying on the results of tests, questionnaires and other assessment tools, reports that [the father] had a full-scale IQ of 76 (well below average range) with a "mental status" score falling in the "dementia range" with some impairment in his ability to interact with his present environment. . . .

. . . .

[The father] remains in treatment with [a licensed clinical social worker] pursuant to his reunification plan. . . . Although [the father's] progress was slow at first, [the licensed clinical social worker] reports some progress over the summer and the fall and [the father] has taken some positive steps to modulate his emotions in stressful situations.

In response to concerns raised by the Department, [the licensed clinical social worker] also worked with both [the father and the mother] as a couple to aid in strengthening their communication skills and to assess the risk for emotional violence in their relationship. [The licensed clinical social worker] reported both parents worked cooperatively in those sessions and gained some insight from their work as a couple on how the dynamic of their relationship will impact their children.

. . . [The father's adult case manager] . . . is assisting [the father to] retrieve his medical records, locate a primary care physician, and obtain his academic records so that he can complete his GED. [The father] also testified that he is researching vocational rehabilitation services to help him secure training and employment utilizing skills he has or is most capable of developing. Each of these steps taken are addressing the "risk factors" identified in the Court's Order which could otherwise impact [the father's] ability to parent his sons.

[The mother's] therapist . . . echoed the sentiments of [the licensed clinical social worker]. While she noted bouts of inconsistency on the part of [the mother], she reported some engagement and progress on the part of [the mother] over the summer months and through the time of the hearing. . . .

Both parents receive Supplemental Security Income. [The mother] is currently employed part-time at McDonalds and has a valid driver's license and a vehicle. [The mother] is also a certified nursing assistant. [The mother] was working in a nursing facility but was forced to resign from that employment after being assaulted by a patient while pregnant with Brenton. [The father] is unemployed and has never obtained a driver's license. . . .

. . . .

Supervised visits between the children and parents have occurred twice weekly throughout the life of this case. Initially,

visits occurred "in the community" and more recently they have taken place at the parents' Sanford apartment. The supervised in-home visits are intended to allow the parents to enjoy a normal routine with their children, including cooking breakfast, engaging in play and navigating naptime.

Bentlee and Brenton have done well in their foster home placement with the [foster parents]. At various times, the boys have had occupational and physical therapy appointments which [the foster mother] has ensured that they attend. . . . Bentlee and Brenton have developed a bond with [the foster mother] and her husband and the [foster parents] have promoted a relationship between the boys and their maternal grandmother. . . .

Both parents, as noted, have participated in services as requested by DHHS and they have made some progress in dealing with various issues. The parents did not get serious about engaging in a full range of services until the summer of 2016, over a year after Bentlee came into care. Now, many providers are meeting with the parents at their apartment in Sanford. Now, [the father] does not have to leave his home to engage in services; everything is coming to him. Despite such services, neither party has alleviated jeopardy to the point where either can safely parent Bentlee or Brenton on an extended basis.

Since the commencement of these cases, the parents have been visiting with the children twice a week. Initially, visits were from 9 a.m. to 1 p.m. at the [visitation agency center] in Sanford. The parents found four hour visits to be too long. Next visits were from 9 a.m. to 11 a.m. In September 2016, visits were increased by one hour, from 8 a.m. to 11 a.m. and the parents now complain that visits start too early in the day. Throughout the course of the case, [the father] has been unable to remain fully engaged with the children during visits. [The father] takes frequent smoking breaks outside the apartment and he takes frequent bathroom breaks (of 10 to 15 minutes' duration) during child visits. It is not unusual for [the father] to miss 1/4 to 1/3 of the allotted child visitation period due to these recurring smoking and bathroom breaks. [The father]

does not feel that his need to be away from the children during visits is a matter for concern. In the Court's mind, it does raise concerns about [the father's] capacity and determination to care for the children appropriately. The Court also finds it significant that [the father] and [the mother] have been unable, despite the many services provided to them, to progress to something more than two supervised visits per week since the filing of the case. This, in turn, raises concerns about their capacity and the determination to safely parent the boys on something more than a part-time basis.

[The father's] and [the mother's] ability to tolerate uncomfortable situations for the sake of their children is clearly compromised. Both boys have received occupational and physical therapy during their time in care. Physical therapy sessions occur at the therapist's office . . . . Occupational therapy occurs at [the foster mother's] home in North Berwick, Maine. Although [the foster mother] has expressed reservations about [the father] being present at her home, she and the team have invited both parents to attend treatment sessions. [The father] refuses to attend sessions at the [foster mother's] home because he dislikes [the foster mother] . . . .

. . . As of the date of the hearing . . . [the case manager] had not been successful in getting [the father] into vocational rehabilitation, or securing his school records, or securing and getting [the father] to complete his GED application, or finding employment or securing his medical records. [The father] did not, apparently, make the effort to get this work done. What [the father] does all day is, frankly, a mystery.

The Court understands from the testimony that [the father] . . . was "jumped" in downtown Sanford last year by a group of men and he sustained an injury. [The father] chose not to report this assault to the police. Likewise, [the father] and [the mother] testified that their home was broken into, last year, and items were stolen from the home but they chose not to report the incident to the police because the police haven't been helpful to them in the

past. At night, [the father] likes to go ATV riding, a hobby. [The father] has sustained multiple injuries while driving his ATV at night but he has avoided medical treatment at the Sanford hospital . . . because, he testified, the hospital staff disrespects him. When [the father] goes riding at night on his ATV he is often too tired to engage with the children during morning visits. . . . [The father's] and [the mother's] failure to report his assault and the home burglary to the police raises some concern about whether Bentlee or Brenton would be safe in the care of their parents. Likewise, [the father's] nighttime ATV riding, a purely "elective" activity often taking place just hours before the start of child visits, calls into question his commitment to reunifying and fully engaging with the children given that the pain and fatigue he often experiences interferes with and compromises his ability to parent the children.

At this point, [the father] presents with all the same deficits he presented with at the start of this, except for a nascent ability to manage his anger. His cognitive deficits along with his lack of foresight seriously impact his ability to safely parent these children individually or together with [the mother]. [The father's] lack of care around his personal health and safety, his inability to meet basic educational and employment goals and his inability to take the initiative to put himself in a place where he can effectively parent and provide for the needs of his children does not bode well for his ability to meet the daily needs of two young and wholly dependent children.

[The mother], for her part, has engaged in services on a consistent basis in the months immediately preceding the hearing, despite a slow start where she often skipped scheduled appointments and classes. The mother, despite years of services, continues to struggle with emotional and mental health problems that interfere with her ability to parent the boys. As recently as November 14, 2016, [the mother] had to cut short a supervised child visit because she was unable to regulate her emotions sufficiently to parent the boys. While [the mother] receives support from [a case manager], [the mother] continues to struggle to maintain her mental health and manage her ADHD, she and [the

8

father] struggle to maintain healthy communication and [the mother] continues to be ambivalent about . . . placing the needs of her children ahead of those of her romantic relationship, even if the romantic relationship could pose a risk to her children. At the end of the day, the Court agrees with the [guardian ad litem's] assessment that "I have not seen sufficient evidence that [the mother] has increased her protective capacity or is prepared to make decisions that put her children's needs and safety ahead of her own relationships." [The mother] acquiesces in [the father's] poor decision-making and she remains with him despite [the mother's other son's] disclosure of sexual abuse. By remaining with [the father], she continues to prioritize her need to be in a relationship with him over the needs of her children.

(Citations omitted) (footnote omitted).

## II. DISCUSSION

[¶3] We review the court's findings on parental unfitness for clear error, *In re Mathew H.*, 2017 ME 151, ¶ 2, 167 A.3d 561, and its conclusion that termination is in the child's best interest for an abuse of discretion, "viewing the facts, and the weight to be given them, through the trial court's lens." *In re R.M.*, 2015 ME 38, ¶ 7, 114 A.3d 212. We will not disturb the court's jeopardy findings unless those findings are "clearly erroneous." *In re Dorothy V.*, 2001 ME 97, ¶ 12, 774 A.2d 1118.

[¶4] Here, competent record evidence supports the court's findings, by clear and convincing evidence, that both parents are unable to take responsibility for Bentlee G., and that they are unwilling or unable to protect

him from jeopardy within a time reasonably calculated to meet his needs. *See* 22 M.R.S. § 4055(1)(B)(2)(b)(i)-(ii). Competent evidence also supports the court's discretionary finding that termination of the parents' parental rights is in his best interest. *See id.* § 4055(1)(B)(2)(a). Also, the court's finding, by a preponderance of the evidence, that Brenton G. was in circumstances of jeopardy to his health and safety was not clearly erroneous. *See id.* § 4035(2).

[¶5] The mother, relying on the due process clause of the Maine and United States Constitutions, argues that the January 26, 2016, jeopardy order as to Bentlee G. is "void for vagueness." To the extent this argument represents a direct appeal from the jeopardy order, even assuming that the void-for-vagueness doctrine applies in the child protection context, the issue is not properly before us. A jeopardy order is a final judgment, and must therefore be reviewed on direct appeal. *See* 22 M.R.S. §§ 4006, 4035 (2016). Accordingly, the mother was required to appeal the jeopardy order within twenty-one days after it was entered. *See* M.R. App. P. 2(b)(3) (Tower 2016);[1] *Collins v. Dep't of Corr.*, 2015 ME 112, ¶ 10, 122 A.3d 955 (holding that "[s]trict compliance with the time limits of M.R. App. P. 2(b) . . . is a prerequisite to the Law Court

---

[1] The restyled Maine Rules of Appellate Procedure do not apply because this appeal was filed prior to September 1, 2017. *See* M.R. App. P. 1 (restyled Rules).

entertaining an appeal" (quotation marks omitted)). To the extent, however, that the mother is arguing that the court erred in terminating her parental rights to Bentlee G. because the jeopardy order—seen as a predicate to the termination order—was defective, her contention is unpersuasive.

The entry is:

Judgment affirmed.

---

Amy McNally, Esq., Woodman Edmands Danylik Austin Smith & Jacques, P.A., Biddeford, for appellant father

Nathaniel Seth Levy, Esq., Brunswick, for appellant mother

Janet T. Mills, Attorney General, and Hunter C. Umphrey, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Springvale District Court docket numbers PC-2015-16 and PC-2016-27
FOR CLERK REFERENCE ONLY